IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

N.G., by and through their legal guardian, V.G.,

             Plaintiff,

      v.

Ohio Department of Developmental
Disabilities, et al.,

             Defendants.

Case No. 2:24-cv-2027
District Judge James L. Graham
Magistrate Judge Elizabeth P. Deavers

Opinion and Order

This action is brought on behalf of N.G., a 27-year old individual with a severe developmental disability, to prevent the State of Ohio from discharging him from its care at the Southwest Ohio Developmental Center (SODC).  V.G. is the parent and legal guardian of N.G., and she received notice from Mary Gillespie, the Superintendent of SODC, of its intent to discharge N.G from SODC in April 2024.  V.G. then filed this suit for an injunction to prevent her son's discharge, which she claims would violate, among other things, his rights to Due Process and Equal Protection under the United States Constitution.

This matter is now before the Court on defendants' motion to dismiss the Amended Complaint.  For the reasons stated below, the motion to dismiss is granted in part and denied in part.

I.      **Background**

      A.      **Factual Allegations**

As alleged in the Amended Verified Complaint, N.G. suffers from Hunter Syndrome, a rare lysosomal storage disorder that results in serious disability and a shortened lifespan.  N.G.'s body lacks an enzyme necessary to break down a type of sugar molecule known as glycosaminoglycans.  As glycosaminoglycans has accumulated in his body, it has caused progressive and permanent neurological damage and related physical and behavioral impairments.  The damage has impacted N.G.'s neurological system, cognitive function, joints, and cardiac function.  He is non-verbal, in chronic pain, and unable to care for himself.  N.G. displays a range of aggressive behaviors, including elevated agitation, biting, hitting, kicking, and throwing objects.

1

N.G. lived with his family until they determined in 2020 that they could no longer care for him.  At the recommendation of the Clermont County Board of Developmental Disabilities, N.G. was voluntarily admitted into SODC for residence in September 2020.  *See* SODC Social History Report for N.G. (Doc. 41-6), at PAGEID 452.

SODC is licensed and operated by defendant Ohio Department of Developmental Disabilities (DODD).  *See* O.R.C. § 5123.19.  Both SODC and DODD are named as defendants, as are Superintendent Gillespie and Kimberly Hauck, the Director of DODD.

SODC has a large, 24-hour staff, and the resources needed to provide "comprehensive medical, behavioral, and residential services."  Am. Compl, (Doc. 41), ¶ 41.  SODC is classified under Medicaid as an Intermediate Care Facility for Individuals with Intellectual Disabilities.  *See* O.A.C. 5123-8-01.  Despite the term "Intermediate" being in the classification, SODC provides the highest level of institutional care for N.G.'s severe developmental disability.

N.G. is on a regimen of medications designed to alleviate his symptoms.  The medications include a mood stabilizer to calm him when he becomes agitated or manifests aggressive behaviors and nerve pain medication used for anxiety and assistance with sleep.  Incidents of major and minor physical aggression by N.G. are tracked and recorded on a monthly basis by staff at SODC.

According to the Complaint, defendants have "long bristled at N.G.'s family's involvement in N.G.'s care."  Am. Compl., ¶ 71.  His parents have actively advocated for their son and have expressed concerns about the medical treatment he has received at SODC.  "Given the complexity of his care caused by his disability, and N.G.'s fragility and susceptibility to illness, the family had regular and even daily contact with SODC staff regarding medical issues, such as drug choices and potential drug interactions."  *Id.*, ¶ 73.

The Complaint alleges that in January 2024, Superintendent Gillespie and Director Hauck "limited N.G.'s family's movements within the SODC and access to N.G."  *Id.*, ¶ 74.  V.G. was not allowed to visit N.G. unless accompanied by Superintendent Gillespie or SODC's program director.  Monthly "Special Team Meetings," in which N.G.'s parents had participated to discuss his care, were canceled by SODC in January and February 2024.  Plaintiff alleges that defendants' purpose in closing off access was to limit the parents' ability to observe N.G.'s day-to-day condition and behaviors at SODC, and ultimately to hinder their ability to challenge SODC's planned discharge of N.G.

On February 23, 2024, Superintendent Gillespie gave a Notice of Discharge to V.G.  *See* Doc. 41-3.  It stated that following a comprehensive evaluation of N.G., SODC's team had concluded that "continued institutionalization of [N.G.] at SODC is no longer advisable.  It is the judgment of the

superintendent and the chief program director that discharge is the most effective use of the institution in the continuing pursuit of the habilitation and care of persons with developmental disabilities." *Id.*[1] The Notice stated that SODC intended to discharge N.G. on March 25, 2024, and it advised V.G. of her right, on behalf of her son, to file a complaint regarding the Notice with Director Hauck. *See id.* (citing O.A.C. 5123-11-02).

The comprehensive evaluation on which Superintendent Gillespie's discharge decision was based included various assessments of N.G. performed by SODC staff, including: (1) a behavioral assessment by a supervising psychologist, (2) a social history report prepared by a social worker, (3) a plan and progress review by the program director, (4) a medical review by the medical director, and (5) a report from a psychiatrist. *See* Doc. 41-6. Generally speaking, the various components of the evaluation found that N.G.'s condition and behavior had stabilized and that he could be cared for in a community-based setting. For instance, the medical review stated that N.G. was now "eating and drinking normally," "has gained weight, walks independently, and is happy most of the time." Doc. 41-6 at PAGEID 441. The program director reviewed the goals established for N.G.'s daily routine (dressing, eating/drinking, hygiene, etc.), reviewed the progress he had made, and concluded that the goals could be carried over into a community setting, such that he "does not need the services provided by [SODC]." *Id.* at PAGEID 440. The psychiatrist believed that N.G. could receive appropriate treatment from providers outside of SODC. *Id.* at PAGEID 458.

Prior to issuing the Notice of Discharge, Superintendent Gillespie authored her own review on February 15, 2024. She noted that the N.G. was originally admitted as a "short-term admission to address the guardian request for behavior and medication stabilization." *Id.* at PAGEID 438. She found that SODC's team had been able to establish routines and a course of medication which addressed his behavioral issues. The team had determined that N.G.'s aggressive behaviors stemmed from discomfort resulting from ear infections, constipation, and tooth pain. Superintendent Gillespie noted that N.G.'s parents "frequently" took him home. *Id.* She also noted that his parents had caused "disruption" in the team's ability to implement plans for N.G through their unnecessary "demands and constant questioning of the facility physicians." *Id.* She believed that N.G.'s needs could be met by the physicians whom N.G.'s parents had engaged and in community setting.

According to the Complaint, the Notice of Discharge and the evaluation on which it was based were without a legitimate basis in fact. In support, plaintiff points to several considerations, including

---

[1] This language tracked the statutory requirements for discharge of an individual who was voluntarily admitted. *See* O.R.C. § 5123.69(C).

the abrupt nature of the discharge decision. Recent Special Team Meetings had not contemplated a discharge. The behavioral assessment, which had been performed several months before the discharge decision, stated that "there are no current plans to transition him into the community." *Id.* at PAGEID 449. In addition, plaintiff believes that the team at SODC underreported N.G.'s aggressive behaviors in late 2023. Through October 2023, N.G. had averaged 19.6 incidents of minor aggression per month and 12.7 incidents of major aggression per month. Am. Compl., ¶ 67. But an unexplained and radical departure was reported in November and December of 2023: a combined 1 minor incident and zero major incidents. *Id.*, ¶ 68; *see also* Dec. 29, 2023 Special Review (Doc. 41-5), at PAGEID 437. Plaintiff also points out that the stability in N.G.'s weight and his ability to walk were not new developments, as the medical review claimed. *See* V.G. Aff. (Doc. 41-4), ¶ 2. And plaintiff alleges that N.G. was not "happy most of the time," as counsel for plaintiff would later obtain records showing that N.G. had a total of 99 minor incidents and 63 major incidents of aggression in January and February 2024. *See* June 10, 2024 Special Review (Doc. 41-8), at PAGEID 464. SODC increased some of N.G.'s medications in early 2024 to combat pain, constipation, and aggressive behavior. *See* V.G. Aff., ¶ 3. Finally, plaintiff points to the underlying nature of Hunter Syndrome, namely that it causes irreversible decline and progressively worsens. *See* Dr. Muenzer and Dr. Eisengart letters (Docs. 41-1, 41-2).

Plaintiff contends that certain statements in defendants' records reveal animus toward N.G.'s parents for their lawful advocacy for their son. The medical review stated that "[w]henever we try to treat him here, his guardians want him taken to Children's for treatment. They have even refused to let us have his blood drawn here." Doc. 41-6 at PAGEID 441. The medical director continued, "Coordinating his care is delayed due to various issues with the guardians withholding consents to making any changes or arranging appointments at the last minute." *Id.* She added, "There are too many physicians involved in his care. He already has a multidisciplinary primary care physician who coordinates his care at Children's." *Id.* at PAGEID 442. Superintendent Gillespie's February 15, 2024 review included her observation that N.G.'s parents had been disruptive, made unnecessary demands, and second-guessed the judgment of SODC's physicians. *See id.* at PAGEID 438.

### B.    Procedural History

With their legal counsel present, N.G.'s parents met with SODC staff on March 25, 2024 for a discharge meeting. *See* Doc. 41-9. V.G. refused to sign a release form, and SODC agreed to defer the discharge date until April 30, 2024.

This suit was filed on April 29, 2024, along with a motion for a temporary restraining order which would prevent SODC from discharging N.G.  The Court conducted a telephone conference with counsel for both sides on April 29.  Defendants agreed to a standstill agreement by which they would not discharge N.G. while the parties pursued mediation.

Meanwhile, plaintiff faced a time deadline to initiate an administrative challenge with the State.  On May 21, 2024, V.G. filed an administrative complaint with the DODD pursuant to O.A.C. 5123-11-02.  *See* Doc. 41-10.  In the complaint, V.G. challenged the Notice of Discharge on substantive and procedural grounds.  She also requested the appointment of an independent hearing examiner, the right to conduct discovery, and the right to a hearing in which complainant could call witnesses, present evidence, and cross-examine the State's witnesses.  She further requested that the discharge of N.G. be stayed pending any final decision by Director Hauck.  The complaint argued that the evidence would show that continued institutionalization at SODC was advisable in light of N.G.'s condition, current needs, and prognosis.  The complaint further argued that the evidence would show that N.G.'s continued care at SODC would be an effective use of the institution because it is designed to provide long-term care of individuals with complex needs.

During the months which followed the filing of this lawsuit, the parties made efforts to resolve the matter, including having a settlement conference with the magistrate judge on August 21, 2024.  However, the parties came to an impasse, and a case schedule for this suit was established.  It is the Court's understanding that the administrative proceedings have been stayed pending further developments in this case.

Plaintiff filed an Amended Complaint on October 8, 2024.  Plaintiff amended the Complaint to include allegations that defendants concealed from N.G.' s parents material information regarding his health in early 2024.  Plaintiff further alleges that pursuing the administrative complaint would be a futile act because, among other things, Director Hauck participated in the discharge decision and is not impartial.

The Amended Complaint asserts nine causes of action.  The first three are related in that they all rest upon allegations that defendants discriminated against N.G. because of the nature of his disability.  Count I asserts violations of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*  Plaintiff alleges that in designating N.G. for involuntary discharge, defendants discriminated against N.G. on the basis of his disability and retaliated against him for his parents' advocacy on his behalf.

5

Count II asserts a violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and similarly alleges that defendants discriminated against N.G. by excluding him from full participation in SODC's benefits and services.

Count III is brought under 42 U.S.C. § 1983 and asserts that defendants violated N.G.'s right to equal protection because they singled him out for discharge based on the severity of his disability.

Count IV is also brought under § 1983 for an alleged violation of the Medicaid Act. Plaintiff contends that N.G. has a right under Medicaid to a free choice of provider. In other words, N.G. allegedly may elect to receive all assistance from the State for which he is eligible and he has the right to choose to receive those services from SODC.

Counts V and VI are brought under § 1983 for violations of due process. Plaintiff alleges in Count V that defendants violated N.G.'s right to procedural due process by denying him of a meaningful opportunity to appeal the discharge decision. In Count VI plaintiff alleges that defendants violated N.G.'s right to substantive due process by deciding to discharge him for arbitrary and capricious reasons.

Count VII asserts a claim for retaliation under § 1983. Plaintiff alleges that Ohio law creates rights for individuals with disabilities to receive services from outside providers and to appoint persons to advocate on their behalf. *See* O.R.C. § 5123.62. Plaintiff maintains that defendants have unlawfully retaliated against N.G. for exercising those rights.

In Count VIII for injunctive relief, plaintiff seeks to enjoin the discharge decision as being in violation of N.G.'s rights under O.R.C. § 5123.62 to receive outside medical services, to have an advocate, and to voice grievances without fear of reprisal.

Lastly, Count IX seeks a declaration that defendants have violated N.G.'s rights under Ohio law.

After the Amended Complaint was filed, defendants moved to dismiss. Defendants argue that DODD and SODC are immune from suit under § 1983 and that the Complaint fails to state a claim upon which relief may be granted.

On November 7, 2024, plaintiff filed a motion for preliminary injunction. Plaintiff argued that she is likely to succeed on the merits of her federal claims. She further contended that N.G. will suffer irreparable harm if he is discharged from SODC.

The Court set a hearing for December 17, 2024 on the motion for preliminary injunction. The parties jointly moved to continue the hearing and agreed to extend their standstill agreement (keeping

N.G. at SODC) until after the Court ruled on the motion to dismiss. *See* Doc. 60. The Court granted their motion. *See* Doc. 61.

The parties' joint motion contemplated that the Court would first rule on defendants' motion to dismiss before resolving the motion for preliminary injunction. Specifically, the Court ordered that the "parties shall meet and confer within 21 days after the Court rules on Defendants' Motion to Dismiss (ECF No. 44) to determine whether further proceedings are required regarding Plaintiff's Motion for Preliminary Injunction (ECF No. 47) and to address the agreed standstill regarding Plaintiff's care and residency at the SODC. The parties shall immediately thereafter report to the Court in writing regarding the status of the Motion for Preliminary Injunction and the standstill regarding Plaintiff's residency and care at the SODC." Doc. 61.

In early 2025, the Court was notified by counsel of the parties' interest in resuming mediation attempts. Mediation took place in late April 2025. However, the parties are now again at an impasse.

## II.    Motion to Dismiss Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Iqbal,* 556 U.S. at 679; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Twombly*, 550 U.S. at 555-56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings

that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Though "[s]pecific facts are not necessary," *Erickson*, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-56. This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## III. Discussion

### A. Immunity of DODD and SODC

Defendants contend that DODD and SODC are immune from suit with respect to plaintiff's § 1983 claims (Counts III through VII). Defendants argue that DODD and SODC, as entities created by state law, *see* O.R.C. §§ 121.02(L), 5123.03(A)(1), are arms of the state which are entitled to sovereign immunity. The Court agrees, and plaintiff does not dispute this well-established proposition. "[T]he Eleventh Amendment provides immunity to a state and its agencies from suit in federal court unless the state expressly waives immunity or Congress clearly abrogates the Eleventh Amendment in legislation designed to enforce the Fourteenth Amendment." *Rodgers v. Michigan Dep't of Corr.*, 29 Fed. App'x 259, 260 (6th Cir. 2002) (citing *Welch v. Texas Dep't of Highways and Public Transp.*, 483 U.S. 468, 472–74 (1987)). "Congress did not abrogate the Eleventh Amendment when enacting § 1983," and thus neither a state nor a state agency is a "person" subject to suit under § 1983. *Id.* (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66–71 (1989)).

Accordingly, Counts III through VII are dismissed as to defendants DODD and SODC.

### B. ADA (Count I)

#### 1. Discrimination

Plaintiff alleges that N.G. is an individual with a disability. Defendants allegedly discriminated against N.G. because of the severity of his disability and his need for a high level of care, including coordination with his parents and outside physicians. Plaintiff asserts that defendants' stated intention to discharge N.G. violates Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

To establish a prima facie case of intentional discrimination under the ADA, a plaintiff must show that: (1) he has a disability; (2) he is otherwise qualified; and (3) he was excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of his disability. *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015).

Defendants do not dispute that N.G. has a disability. *See* 42 U.S.C. § 12102(1)(A) (defining "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual); *id.*, § 12102(2)(A) (defining "major life activities" as including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working").

Defendants argue that plaintiff cannot satisfy the "otherwise qualified" element of the claim. In their view, plaintiff in essence is seeking to have N.G. indefinitely institutionalized at SODC – that because plaintiff believes N.G.'s condition is permanent and worsening over time, it must be plaintiff's position that discharge would never be appropriate. Defendants argue that plaintiff cannot prove that N.G. is qualified for indefinite institutionalization because the State has the right under the ADA to make "individualized and fact-specific determinations of a disabled person's medical needs." *Carpenter-Barker v. Ohio Dep't of Medicaid*, 752 Fed. App'x 215, 221 (6th Cir. 2018). Defendants believe that any court order requiring N.G.'s indefinite institutionalization would run contrary to the State's right to make decisions based on assessments of N.G.'s current needs and of the suitability of SODC as a facility in which to place him.

The Court does not interpret plaintiff's claim as seeking indefinite relief which cannot be granted. Instead, plaintiff alleges that N.G.'s current medical condition is such that he qualifies for care at SODC. *See* Am. Compl., ¶¶ 154, 158. Plaintiff further alleges that N.G. is currently eligible to receive residential services at SODC and that his planned discharge is based on discriminatory reasons. *See* Am. Compl., ¶¶ 156, 157. Plaintiff seeks an injunction to prevent the planned discharge, but not an order requiring SODC to indefinitely institutionalize him. *See* Doc. 55 at PAGEID 688 ("N.G. is not seeking an indefinite institutionalization; rather, he is asking that his discharge from SODC not be (and cannot be) because of his disability in violation of the ADA.").

Defendants next argue that plaintiff has not satisfied the third element of a prima facie case. They contend that Superintendent Gillespie's discharge decision was not based on discriminatory motives but on a thorough assessment of the medical evidence and of SODC's institutional needs and resources. Defendants cite case law standing for the general proposition that a State may rely on the reasoned assessments of it professionals in determining which disabled individuals qualify for services or benefits under state-run programs. *See, e.g., Jennings v. Wolf*, No. 3:20-CV-148, 2022 WL 16635644, at *15 (M.D. Pa. Nov. 2, 2022) (discussing *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 602–04 (1999)).

The Court must reject this argument at the pleading stage. While it is true that Superintendent Gillespie stated in her discharge decision that she relied on the comprehensive evaluation performed by SODC staff members, plaintiff adequately alleges that Superintendent Gillespie's purported reasons for discharge were false and pretext for denying N.G. services because of the severity of his disability. For instance, plaintiff alleges that N.G.'s aggressive behaviors had increased at the time of the discharge decision, directly contradicting defendants' evaluation that he was "happy most of the time." Plaintiff further points to statements in defendants' records indicating that they had become frustrated with the need to coordinate N.G.'s care with his parents and outside physicians. The Court finds that the issue of whether defendants had legitimate, non-discriminatory grounds for the decision to discharge N.G. from SODC is a factual one not amenable to resolution on a motion to dismiss. *Cf. Carpenter-Barker*, 752 Fed. App'x at 221 (addressing at the summary judgment stage the lawfulness under the ADA of the state's decision to reduce services to a disabled individual).

The Court thus denies the motion to dismiss as to the claim for ADA discrimination.

## 2. Retaliation

The Complaint also asserts a claim for retaliation. The ADA prohibits retaliation against any individual because they "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter..”  42 U.S.C. § 12203(a).  To state a claim for ADA retaliation, a plaintiff must allege that: (1) he engaged in activity protected under the ADA; (2) defendant knew of that activity; (3) defendant took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

Defendants maintain that the Complaint does not properly allege that plaintiff engaged in protected activity.  Citing Ohio law, plaintiff counters that she, as N.G.'s legal guardian, exercised her rights to engage outside medical providers, participate in decisions, and advocate on N.G.'s behalf.  *See* Am. Compl., ¶¶ 106–109, 160; O.R.C. § 5123.62(E), (F), (Q), (R), (U).  Plaintiff argues that defendants retaliated against N.G. for exercising these rights.  Defendants respond that protected activity within the meaning of 42 U.S.C. § 12203(a) refers to the exercise of rights established by the ADA and not by state law.

The text of the ADA's non-retaliation provision prohibits retaliation for opposing an act or practice made unlawful "by this chapter" or for participating in proceedings "under this chapter."  42 U.S.C. § 12203(a).  As the Sixth Circuit has held, § 12203(a) does not function as "a catchall statute creating a cause of action for any [ ] retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA."  *Rorrer*, 743 F.3d at 1046.  That is, the ADA's non-retaliation provision does not extend to protect activity outside of the purpose and scope of the ADA itself – it is not a means to vindicate other statutorily-created rights.  *See id.* at 1047 (ADA does not cover alleged retaliation against individual for testifying in an arbitration proceeding); *Reynolds v. American National Red* Cross, 701 F.3d 143, 154 (4th Cir. 2012) (dismissing ADA retaliation claim based on the filing of a workers' compensation claim failed because "a workers' compensation claim is not something . . . covered by the ADA.").

While defendants are correct on the law, the Court finds that the Complaint (though citing O.R.C. § 5123.62) contains sufficient factual allegations to state a retaliation claim under the ADA.  Protected activity refers to action taken to protest or oppose statutorily-prohibited discrimination."  *Rorrer*, 743 F.3d at 1046 (internal quotation marks omitted).  The ADA prohibits retaliation against any person for opposing discrimination against a disabled individual or for requesting an accommodation due to a disability.  *See id.*  The relevant issue is whether the alleged retaliation was causally related to disability discrimination.  *See Harmon v. Waterman*, No. 3:23-CV-395-BJB, 2024 WL 3585142, at *4 (W.D. Ky. July 30, 2024), *aff'd*, No. 24-5773, 2025 WL 2434374 (6th Cir. June 6, 2025).

11

Here, the Complaint alleges that N.G.'s parents actively attempted to protect the best interests of their son, who is a severely disabled individual. They communicated their concerns, questions, and opinions with SODC staff and sought the perspective of outside physicians. *See* Am. Compl., ¶¶ 106–111. They advocated for N.G. so that he would receive the services necessary for his disability and opposed care they believed to be inappropriate. The Complaint alleges that defendants became frustrated with their advocacy and that the discharge decision was based on retaliation for their interference with, and second-guessing of, SODC staff.

The Court finds the Complaint sufficiently alleges that N.G.'s parents engaged in protected activity within the meaning of the ADA and that plaintiff has stated a claim for ADA retaliation. The motion to dismiss the claim is therefore denied.[2]

### C. Section 504 of the Rehabilitation Act (Count II)

Under the Rehabilitation Act, a "qualified individual with a disability" shall not, "solely by reason of her or his disability," be "excluded from the participation in" or be "denied the benefits of" a program or activity receiving federal financial assistance. 29 U.S.C. § 794(a). The Complaint asserts both a discrimination claim and a failure-to-accommodate claim under the Act.

Defendants move to dismiss the discrimination claim for one of the same reasons they moved to dismiss the ADA discrimination claim, namely, that Superintendent Gillespie's discharge decision was based on legitimate, nondiscriminatory factors. As stated above, the Court finds the Complaint adequately alleges that the discharge decision was motivated by reason of N.G.'s disability. The Court accordingly finds that the Complaint states a claim for disability discrimination under the Rehabilitation Act. *See Doe v. Woodford Cnty. Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000) (courts analyze claims under the ADA and Rehabilitation Act in accord with each other).

The essential elements of a failure-to-accommodate claim under the Rehabilitation Act are that plaintiff: (1) is an individual with a disability, (2) is otherwise qualified for a program, service, or

---

[2] In allowing the ADA retaliation claim to go forward, the Court recognizes that the Complaint walks a fine line between alleging that, on one hand, defendants retaliated against N.G. because of his parents' opposition to discrimination against their disabled son, and, on the other hand, defendants retaliated because of the parents' disagreement with the best course of medical treatment for N.G. Dissatisfaction with care that "sounds in medical malpractice" does not state a claim under the ADA. *Powell v. Columbus Med. Enters., LLC*, No. 21-3351, 2021 WL 8053886, at *2 (6th Cir. Dec. 13, 2021). And by extension, the Court believes, retaliation against a person for raising a complaint along the lines of malpractice is not covered by the ADA. But at this early stage, the Court will allow the claim to proceed for further factual development regarding the basis and motive of defendants' discharge decision.

benefit, (3) defendant was aware of the disability, (4) plaintiff requested a reasonable accommodation, and (5) defendant failed to provide the requested reasonable accommodation. *Schobert v. CSX Transportation Inc.*, 504 F. Supp. 3d 753, 791–92 (S.D. Ohio 2020) (citing *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020)).

The Complaint alleges that N.G. is eligible to receive residential care at SODC. It further alleges that due to the complex and significant needs related to N.G.'s disability, he is entitled to the accommodation of having his care coordinated with his guardian and outside physicians. Defendants allegedly refused this accommodation.

Defendants argue that the Complaint fails to support an inference that N.G. was denied coordinated care by SODC staff. They point to the numerous allegations in the Complaint showing that N.G.'s parents participated in monthly meetings with SODC to discuss his care and that outside physicians were allowed to treat N.G. and have input about his care. *See* Am. Compl., ¶¶ 56, 57, 73, 104.

The Complaint does in fact allege that for several years N.G.'s parents were actively involved in his care and arranged for outside physicians to treat him. However, the Complaint plainly alleges that in the months leading up to the discharge decision, SODC significantly curtailed the access N.G.'s parents had to staff and to him. SODC canceled the monthly Special Team Meetings in January and February 2024. *See* Am. Compl., ¶¶ 59–60 (further alleging that the March through May 2024 meetings were canceled as well). Also beginning in January 2024, SODC "strictly limited" the visits N.G.'s parents were able to have with him, in an alleged effort to shut them off from his day-to-day condition and behaviors. *See id.*, ¶¶ 74–78. This limitation in access had the further alleged effect of cutting off input from N.G.'s outside treating physicians. *See id.*, ¶ 104.

The Court finds that the Complaint sufficiently alleges that defendants denied plaintiff of the accommodation of having coordinated care prior to the discharge decision. Thus, the motion to dismiss is denied as to plaintiff's claims under the Rehabilitation Act.

### D. Equal Protection (Count III)

The Complaint alleges that defendants singled out N.G. for discharge because of the severity of his disability. Plaintiff contends that other voluntarily-placed residents at SODC have not been identified for involuntarily discharge and that N.G. was so identified because of the seriousness of his disability and the complexity of his care. Plaintiff further alleges that there is no rational basis for the discharge decision because SODC is equipped to provide care for N.G. and the true reason for

discharge is that SODC does not want to continue to provide complex care and coordinate with N.G.'s parents and outside physicians.

The Fourteenth Amendment guarantees the "equal protection of the laws." Courts have construed the guarantee to forbid "governmental discrimination that either (1) burdens a fundamental right, (2) targets a suspect class, or (3) intentionally treats one differently from others similarly situated without any rational basis for the difference." *Green Genie, Inc. v. City of Detroit, Michigan*, 63 F.4th 521, 527 (6th Cir. 2023).

The parties disagree over which type of claim plaintiff is asserting. Defendants argue that the claim is of the third type, also called a "class-of-one" claim. *See id.*; *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). They so argue because the Complaint does not allege that defendants discriminated against disabled individuals as a class. Rather, the Complaint alleges that N.G. was "singled out" for discharge without a rational basis. *See* Am. Compl., ¶¶ 175–76. Plaintiff opposes characterizing the claim as being a class-of-one theory and argues that the claim is of the second type (suspect class). Plaintiff contends that N.G.'s status as a disabled individual is why he was treated differently.

Suspect-class equal protection claims are based on the assertion that plaintiff is a member of a protected class (race, gender) and has been subjected to unequal treatment because of that status. *See Jones v. Union County, TN*, 296 F.3d 417, 426 (6th Cir. 2002) ("Plaintiff must show that she is a member of a protected class and that she was intentionally and purposefully discriminated against because of her membership in that protected class."). In other words, the claim arises from the adverse effects experienced by plaintiff as a result of the defendant's alleged animus against a class. Here, however, plaintiff does not allege that defendants harbored animus against all disabled individuals. The Complaint indeed alleges that other disabled individuals were not subject to unfair treatment at SODC. *See* Am. Compl., ¶ 175.

The Court agrees with defendants that plaintiff's theory that the degree of his disability is what motivated defendants' discharge decision makes it unsuitable for treatment as a suspect-class equal protection claim. The Complaint, though not using the term "class of one," does allege that N.G. has a "rare" and "unique" disability – that he is in effect in his own class. *Id.*, ¶¶ 34, 174. Moreover, the Complaint expressly alleges that the discharge decision lacked a rational basis. *Id.*, ¶ 176. This allegation clearly fits within the third type of equal protection claim.

The Court will therefore analyze the claim as asserting a class-of-one theory. The essential requirements for a class-of-one claim are that plaintiff "has been intentionally treated differently from

others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564; *Green Genie*, 63 F.4th at 527. Putting aside plaintiff's emphasis on the uniqueness of N.G.'s disability, the Court finds that the Complaint sufficiently alleges that N.G. is similarly situated to other residents at SODC. The Complaint alleges that the other residents, like N.G., have medical conditions and disabilities which qualify them for placement at a facility such as SODC, which is classified as an Intermediate Care Facility for Individuals with Intellectual Disabilities. The Complaint alleges that N.G. was voluntarily placed at SODC, like many other residents there. But N.G. was allegedly treated differently from other residents because he was identified for discharge despite remaining eligible to reside at SODC.

Defendants argue that plaintiff cannot satisfy the requirement of showing the discharge decision lacked a rational basis. They argue that a class-of-one theory necessarily fails where the state's conduct involves "discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 603 (2008) (holding that a class-of-one theory cannot be asserted in the public employment context). Repeating the theme that the discharge decision was based upon an individualized assessment of N.G.'s specific needs and situation, defendants argue that plaintiff cannot prove the lack of a rational basis when the decision was inherently discretionary.

In the Court's view, defendants have stated the proposition too broadly. "[C]rucial" to the Supreme Court's holding in *Engquist* was that the state had exercised its broad powers as an employer and not as a sovereign. *Engquist*, 553 U.S. at 598. The "government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Id.* at 599. The Sixth Circuit has declined on several occasions to address whether *Engquist* applies outside of the employment context to other discretionary decisions. *See Johnson v. Morales*, 946 F.3d 911, 939 n.5 (6th Cir. 2020) (citing cases).

At the pleading stage, plaintiff has plausibly asserted that the discharge decision lacked a rational basis. *See Fakhoury v. O'Reilly*, 837 Fed. App'x 333, 339 (6th Cir. 2020) (declining to use *Engquist* to dismiss a class-of-one claim outside the public employment context where plaintiffs' version of the facts supported the claim that defendant "did not engage in legitimate discretionary decisionmaking"). Plaintiff alleges that Superintendent Gillespie did not base her decision on objective medical and behavioral factors or the criteria for discharge set forth in O.R.C. § 5123.69(C). She instead allegedly made her decision based on the personal animus that she and other SODC staff had against N.G.'s parents for their attempts to ensure he received the appropriate level of care. She allegedly made the

decision despite available evidence showing that N.G.'s condition and aggressive behaviors were worsening. *Cf. Klimik v. Kent County Sheriff's Dep't*, 91 Fed. App'x 396, 401 (6th Cir. 2004) (to demonstrate animus, a party "must prove that the challenged government actions were motivated by personal malice"). Defendants' position that the decision was based on a legitimate, individualized assessment of N.G.'s situation is best resolved at a later stage.

Accordingly, the Court finds that the Complaint states an equal protection claim.

### E.    Medicaid Act (Count IV)

The Complaint brings a § 1983 claim alleging that N.G. has a right under the Medicaid Act to exercise a free choice to receive all assistance from the State of Ohio for which he is eligible. Defendants have allegedly violated his right by seeking to discharge N.G. from SODC. In support for the proposition that plaintiff can assert a § 1983 claim to vindicate the alleged right to a free choice of provider under Medicaid, plaintiff cites 42 U.S.C. § 1396a(23)(A) and *Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152 (4th Cir. 2024).

This claim must be dismissed because of the recent United States Supreme Court ruling in *Medina v. Planned Parenthood S. Atl.*, __ U.S. __, 145 S. Ct. 2219 (2025), which directly reversed the Fourth Circuit decision on which plaintiff relies. In *Medina*, the Supreme Court applied the longstanding rule that while "1983 allows private parties to sue state actors who violate their 'rights' under the Constitution and laws of the United States," "federal statutes do not confer 'rights enforceable under § 1983 as a matter of course." *Id.,* 145 S. Ct. at 2227 (cleaned up). Noting that the term "free choice" does not appear in § 1396a(23)(A), the Court found that the Medicaid Act does not clearly and unambiguously use "rights-creating" language. *Id.* at 2236–37. The Court thus held that § 1396a(23)(A) does not confer individual rights enforceable under § 1983. *Id.* at 2239.

Accordingly, Count IV of the Complaint is dismissed.

### F.    Procedural Due Process (Count V)

The Complaint alleges that N.G., having been placed at SODC, has a liberty or property interest in remaining there unless discharged for a permissible reason under state law. The Complaint claims N.G. was deprived of that interest by the improper discharge decision. N.G.'s procedural rights were allegedly violated because defendants denied him of a meaningful opportunity to contest the discharge decision.

The Due Process Clause of the Fourteenth Amendment protects citizens from government deprivations of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to establish a procedural due process claim in a § 1983 action, a plaintiff must show: (1) he

has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment, (2) he was deprived of this protected interest within the meaning of the Due Process Clause, and (3) the state did not afford adequate procedural rights prior to depriving plaintiff of his protected interest. *Cooperrider v. Woods*, 127 F.4th 1019, 1042 (6th Cir. 2025).

In their motion to dismiss, defendants challenge whether plaintiff can demonstrate that N.G. has a protectable interest in remaining at SODC. "A property or liberty interest owes its existence to the regime of state laws or rules that define the dimensions of that interest." *Merck v. Walmart, Inc*, 114 F.4th 762, 781 (6th Cir. 2024). Protected interests in this realm "are not created by the Constitution" but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). In order for a property or liberty interest to be protectable, an individual must have more than an "abstract need or desire for it" and more than "a unilateral expectation of it." *Id.* "He must, instead, have a legitimate claim of entitlement to it." *Id.*

The parties rely on two separate provisions of Ohio law. Plaintiff cites § 5123.62 of the Revised Code, which is entitled "Rights of persons with a developmental disability." Those rights include the right of access to "appropriate medical treatment," "necessary ancillary services" (including various forms of therapy and psychological services), and "appropriate care and treatment." O.R.C. § 5123.62(E), (F), (G). In *Martin v. Voinovich*, 840 F. Supp. 1175, 1206 (S.D. Ohio 1993) (Smith, J.), the court held that "the use of the term 'right' [in § 5123.62] gives rise to property and liberty interests that require the protection of procedural due process." The argument that Ohio law creates a legitimate claim to appropriate medical treatment and ancillary care is reinforced by § 5123.64(A), which provides that staff members and providers of services to persons with developmental disabilities must observe the rights set forth in § 5123.62. Plaintiff argues that N.G. has a claim of entitlement to continued residency at SODC because that facility provides the medical treatment and ancillary services which are appropriate and necessary in light of his condition and needs.

Defendants rely on O.R.C. § 5123.69, which is entitled "Voluntary admission." It provides for discharge of a voluntarily-admitted resident when "the results of a comprehensive examination indicate that institutionalization no longer is advisable" or when "the discharge would contribute to the most effective use of the institution in the habilitation and care of persons with developmental disabilities." O.R.C. § 5123.69(C). Defendants argue that the key terms of § 5123.69(C) on which the discharge decision turns are "advisable" and "most effective use." These terms, they argue, are too amorphous to give a resident a legitimate claim of entitlement to remain at SODC. Defendants

contend that the discharge decision ultimately falls within the broad discretion of the Superintendent as to what is best for the disabled individual and the facility.

Against this statutory backdrop, the parties argue that the respective provisions on which they rely should trump the other. Plaintiff argues that § 5123.62 should control the analysis because of its express, rights-creating language. Defendants argue that § 5123.69(C) should control because it deals specifically with the discharge decision, whereas § 5123.62 is a more generalized statute. *See United States v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004) ("One of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one.").

The Court provisionally finds at this early stage that the Complaint sufficiently alleges that N.G. has a protectable interest in continued residency at SODC. The Complaint alleges that the severity of his current condition qualifies him for continuing to receive medical treatment and ancillary services at SODC. It alleges that he is eligible and entitled to receive those services unless the Superintendent, applying the statutory criteria, properly determines that he should be discharged.

The Court understands defendants' position that the statutory language appears to allow the Superintendent a measure of latitude in making the discharge decision. However, the Court will refrain from determining whether one provision of Chapter 5123 trumps another. It suffices for purposes of the current motion to note that § 5123.69(C) makes reference to the decision being based on "the results of a comprehensive examination." At least as applied to N.G., the comprehensive examination consisted of a set of particularized evaluations which guided the decision. Superintendent Gillespie cited to five specific components of the examination: psychological/behavioral evaluation, social history report, programmatic plan and progress review, medical review, and psychiatric report. Doc. 41-6 at PAGEID 438; *see also* O.R.C. § 5123.01(C) (defining "comprehensive evaluation" as a "study, including a sequence of observations and examinations, of a person leading to conclusions and recommendations formulated jointly, with dissenting opinions if any, by a group of persons with special training and experience in the diagnosis and management of persons with developmental disabilities, which group shall include individuals who are professionally qualified in the fields of medicine, psychology, and social work, together with such other specialists as the individual case may require.").

The Court thus finds that, construing the allegations and materials attached to the Complaint in favor of plaintiff, N.G. has a protectable interest in residency at SODC. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (holding that a protected interest is created if the State places "substantive

limitations on official discretion," as opposed to allowing the decisionmaker to deny "relief for any constitutionally permissible reason or for no reason at all") (internal quotation marks omitted).

Defendants next turn to the third element of a due process claim – whether the person being deprived of a protected interest has an opportunity to be heard at a meaningful time and in a meaningful manner. *See Johnson v. City of Saginaw*, 980 F.3d 497, 507-08 (6th Cir. 2020). Defendants argue that plaintiff cannot show the State failed to afford adequate procedural rights prior to depriving N.G. of his protected interest.

Ohio law sets forth an administrative grievance procedure for complaints involving the DODD. It provides that any aggrieved person "may file a complaint involving the programs, services, policies, or administrative practices of the department." O.A.C. 5123-11-02(B)(1). The aggrieved person is to file a complaint with the Director of the DODD within 90 days of the opposed action, and the complaint must state the "facts giving rise to the complaint," the identity of "each person involved in the complaint," any steps taken to resolve the complaint, and "any statute and/or administrative rule the complainant contends was not followed." O.A.C. 5123-11-02(C)(1). The Director may "[o]btain additional relevant information and conduct interviews with any relevant parties" and offer mediation to the involved parties. O.A.C. 5123-11-02(C)(2). The Director is to issue a written decision within 30 days of receipt of the complaint, but may may extend timelines for good cause. O.A.C. 5123-11-02(C)(3), (4).

It should be noted that plaintiff does not appear to be raising a facial challenge to the constitutionality of O.A.C. 5123-11-02. That is, plaintiff is not asking the Court to declare that O.A.C. 5123-11-02 is unconstitutionally deficient on its face and strike it down. Rather, plaintiff contends that the process provided is deficient as applied to him. The Court, however, finds that the allegations of the Complaint, along with other undisputed developments, undercut plaintiff's position and demonstrate that the procedural due process claim is not ripe for review.

Plaintiff filed an administrative complaint after initiating this lawsuit. Those proceedings have been stayed pending further developments in this case. Here, the Complaint alleges that the process due under Ohio law for his grievance will not be adequate in N.G.'s situation. Plaintiff contends that there is no guarantee that the grievance will be resolved before SODC discharges N.G. Plaintiff further maintains that SODC withheld information regarding N.G. until after the grievance was filed, thereby impairing plaintiff's ability to present N.G.'s case. Finally, plaintiff anticipates that administrative review will not comport with due process because Director Hauck "was directly involved in and blessed the decision to discharge N.G." and thus will not be impartial. Am. Compl.,

¶ 190. In sum, plaintiff alleges that proceeding with the administrative grievance process will be a futile act.

Plaintiff's claim that defendants could discharge N.G. before his grievance is heard is speculative and inconsistent with defendants' position in this litigation. When this suit was filed, defendants agreed to a standstill agreement by which they would not discharge N.G. while the parties pursued mediation, which lasted many months. After plaintiff filed an Amended Complaint and moved for a preliminary injunction, defendants agreed to extend their standstill agreement until after the Court rules on the motion to dismiss. In short, defendants have exhibited a commitment to preserve the status quo, keeping N.G. at SODC, pending further direction from the Court.

Plaintiff's contention about information being withheld likewise falls short. The Complaint alleges that although defendants were not initially forthcoming with N.G.'s behavioral and health data from January through May 2024, defendants provided the information to plaintiff in June 2024. *See id.*, ¶¶ 93, 102. Plaintiff has not identified any information which is necessary to pursuing the administrative complaint but which defendants have withheld from plaintiff or legal counsel.

Finally, plaintiff alleges that administrative review of the complaint will not be fair because Director Hauck is biased. The Court again finds that plaintiff's anticipation of a procedural deficiency is speculative and not supported by the allegations. The Complaint makes a general allegation that Director Hauck was involved in and "blessed" the discharge decision. However, the only matter in which Director Hauck is specifically alleged to have participated was being consulted in the decision which Superintendent Gillespie and the SODC program director made in January 2024 to limit N.G.'s parents' movements in the facility. *See id.*, ¶ 74. The Complaint does not allege that Superintendent Gillespie needed or sought approval of the discharge decision from Director Hauck. And there is no indication in the discharge-related documents attached to the Complaint of Director Hauck participating in or influencing the decision. Moreover, the Complaint acknowledges that legal counsel for Director Hauck attempted to resolve plaintiff's concerns of bias by stating that a hearing officer would be appointed to hear the complaint. *See id.*, ¶ 124; *see also* Doc. 44 at 539 (defendants' brief stating that they promised to "appoint an independent hearing examiner to hear N.G.'s complaint"). Lastly, the Court takes judicial notice that Director Hauck is no longer Director of the DODD and will not be hearing the administrative complaint in any event, making moot plaintiff's concerns of bias. *See* June 30, 2025 DODD Press Release, https://dodd.ohio.gov/wps/portal/gov/dodd/about-us/divisions/office-of-the-director (announcing Director Hauck's retirement effective June 27, 2025).

Accordingly, the Court finds that plaintiff's procedural due process claim is not ripe, and it is dismissed without prejudice.

### G.    Substantive Due Process (Count VI)

The Complaint next asserts a substantive due process claim.  It alleges that N.G. has a protected right to remain at SODC and defendants violated his right by deciding to discharge him for arbitrary and capricious reasons.

The Due Process Clause has a substantive component.  In contrast to procedural due process, "substantive due process is the doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Kerchen v. Univ. of Michigan*, 100 F.4th 751, 763 (6th Cir. 2024) (cleaned up).  Substantive due process "protects both constitutionally enumerated rights, as well as rights 'so rooted in the traditions of the people as to be ranked fundamental' and implicit in the concept of ordered liberty, or the interest in freedom from government actions that 'shock the conscience.'" *Chambers v. Sanders*, 63 F.4th 1092, 1096 (6th Cir. 2023) (quoting *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014)).  The interests protected by substantive due process are "much narrower than those protected by procedural due process." *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003).

Defendants argue that plaintiff has failed to allege the existence of a right protected by substantive due process.  The Court agrees.  While procedural due process protects interests created by state law, substantive due process protects constitutionally-enumerated rights and rights deemed "fundamental." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 856, 862 (6th Cir. 2012).  Thus, state-created rights generally are not protected by substantive due process.  *See id.* at 862; *Bell*, 351 F.3d at 250 ("Most property interests warranting the protection of procedural due process, for instance, may be substantively modified or abolished by the legislature.").  The Complaint alleges that N.G. has a protected interest created by state law in remaining at SODC until the criteria for discharge in O.R.C. § 5123.69 are satisfied.  *See* Am. Compl., ¶ 193.  In response to the motion to dismiss, plaintiff cites O.R.C. §§ 5123.62, 5123.69 as the source of N.G.'s protected interest.  Plaintiff, however, fails to cite to any authority in support of the proposition that N.G.'s state-created rights are protected by substantive due process.

As noted above, the court in *Martin v. Voinovich* held that Chapter 5123 of the Ohio Revised Code creates rights which receive procedural due process protection.  In *Martin*, individuals with developmental disabilities brought suit against state officials to challenge the State's denial of community housing services.  Plaintiffs also asserted a substantive due process claim, for which the

21

court applied Sixth Circuit case law holding that substantive due process rights must be derived from a guarantee under the United States Constitution and not from state law. *See Martin*, 840 F. Supp. at 1205 (citing *Mansfield Apartment Owners v. Mansfield*, 988 F.2d 1469 (6th Cir. 1993); *Mertik v. Blalock*, 983 F.2d 1353, 1367–68 (6th Cir. 1993). *Charles v. Baesler*, 910 F.2d 1349, 1354 (6th Cir. 1990). In light of this authority, the court held that the plaintiffs did not have a substantive due process right to community housing under O.R.C. § 5123.62. *See id.* The court further rejected the claim that plaintiffs had a fundamental liberty interest in voluntary residential placement.[3] *See id.* at 1206–07. This Court follows *Martin* in holding that N.G. does not have a protected interest under substantive due process to remain at a state-operated facility.

Apart from having a protected interest, plaintiff alleges that N.G. has a right to be free from conscience-shocking government action. The Complaint, while not expressly stating a "shocks the conscience" theory, does allege that the discharge decision was arbitrary and capricious. Because "arbitrary and capricious" is sometimes synonymous with "shocks the conscience," the Court will consider plaintiff's theory. *See Kerchen*, 100 F.4th at 763 (stating that substantive due process "protects individuals against deprivations based on arbitrary and capricious action, another formulation of the shocks the conscience standard") (internal quotation marks omitted).

As an initial matter, the Court finds that plaintiff likely cannot assert a substantive due process claim absent a protected interest. Although Sixth Circuit case law is not uniform, the weight of authority holds that "government action will not shock the conscience unless the arbitrary and capricious action touches on a protectable interest." *EJS Props.*, 698 F.3d at 861–62 (discussing the inconsistency in case law and noting that some cases "discuss substantive due process claims independently from the identification of any liberty or property interest"); *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992) ("To establish a violation of substantive due process, a plaintiff must first establish the existence of a constitutionally-protected property or liberty interest."); *Kerchen*, 100 F.4th at 763 (requiring plaintiffs to have "pleaded the deprivation of a protectable interest under the Constitution" before considering whether the government's conduct shocked the conscience); *Andreano v. City of Westlake*, 136 Fed. App'x 865, 870-71 (6th Cir. 2005) ("Proving a violation of substantive due process requires not only that the challenged state action was arbitrary and capricious, but also that the plaintiff has a constitutionally protected property or liberty

---

[3] Plaintiff does not allege that N.G. has fundamental right to residential placement. Plaintiff relies on the right being one "created at state law." Am. Compl., ¶ 198.

interest."). Because the Complaint does not identify a protectable interest, plaintiff's theory fails for that reason alone.

Moreover, the Court finds that the Complaint fails to allege conduct so egregious as to shock the conscience. The Court wishes to tread carefully, recognizing the severity of N.G.'s disability and his vulnerable condition. The standard though is exacting. *See Range*, 763 F.3d at 589 (stating that the "'shocks the conscience' standard sets a high bar"). To shock the conscience, conduct must violate the "'decencies of civilized conduct.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). "Such conduct includes actions so brutal and offensive that they do not comport with traditional ideas of fair play and decency." *Range*, 763 F.3d at 589–90 (cleaned up). "[T]he 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." *Id.* at 590.

The Complaint does not allege that defendants have abused, mistreated, or harmed N.G. in any way. *Cf. Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 566 Fed. App'x 462, 472 (6th Cir. 2014) (stating that the "shocks the conscience" standard is generally reserved for cases involving physical abuse). Plaintiff nonetheless argues that if N.G. were to be discharged, it would subject him to life-threatening consequences. That is, discharging an individual as vulnerable as N.G. from SODC, where he receives life-sustaining care, would be an act of brutal indifference to N.G.'s well-being.

The materials attached to the Complaint do not support an inference that Superintendent Gillespie's discharge decision was outside the bounds of civilized decency. Importantly, she was not kicking N.G. out to live on the streets. *See Kerchen*, 100 F.4th at 764 (the shocks-the-conscience standard requires a showing of deliberate indifference to a substantial risk of serious harm). The Complaint demonstrates that Superintendent Gillespie knew N.G.'s parents had a team of physicians who were already providing, and would be able continue to provide, treatment upon discharge. Indeed, plaintiff's theory of the case – that the discharge decision was improperly motivated by frustration on the part of Superintendent Gillespie and SODC staff that N.G.'s parents had "too many physicians involved in his care," Doc. 41-6. at PAGEID 442 – recognizes that Superintendent Gillespie was aware of the care available to N.G. upon his discharge. Specifically, Superintendent Gillespie knew that N.G.'s parents had a multidisciplinary primary care physician at Cincinnati Children's Hospital who would be coordinating his care. *See id.* She knew too that N.G.'s parents also had "well established" outside specialists providing treatment. *Id.* at PAGEID 438. And Superintendent Gillespie expressly offered in her discharge decision that the DODD and staff at

SODC would work with N.G.'s parents and coordinate with the Clermont County Board of Developmental Disabilities to determine a suitable place for N.G. to reside. *See* Doc. 41-3; Doc. 41-6 at PAGEID 458 (psychiatrist report providing recommendation of facility for continued care of N.G.).

Plaintiff does not dispute that Superintendent Gillespie and SODC staff attempted to help transition N.G.'s care. *See* Am. Compl., ¶ 117 (alleging that V.G. was presented with a consent form to allow SODC to share N.G.'s medical information to prospective new facilities); Doc. 41-9 (DODD letter requesting that V.G. sign the consent form "so that his living arrangement[s] and services can be in place upon discharge"). But plaintiff alleges that the prospect of "moving N.G. presents an imminent risk of harm to him." Am. Compl., ¶ 120. According to plaintiff, it is imperative for N.G.'s well-being that he receive specialized care and support services in a residential facility and not be forced to "return to his parent's home." *See* Doc. 41-1 at PAGEID 426. Plaintiff stresses that a discharge from SODC and the accompanying change in N.G.'s environment would pose a substantial risk to his health and safety. *See id.*; Doc. 41-2 at PAGEID 429.

The Complaint does not allege that Superintendent Gillespie was attempting to force N.G. to return to live with his parents. It is undisputed that N.G.'s parents have had the option of placing him in a private Intermediate Care Facility. *See* O.A.C. 5123-3 (regulation of licensed residential facilities). Again, Superintendent Gillespie and the DODD offered to assist N.G.'s parents in finding "the best alternative place for N.G. to reside," Doc. 41-3, and the evaluations which comprised the comprehensive examination anticipated continued care by medical professionals upon discharge. *See* Doc 41-6 at PAGEID 440, 442, 457, 458. Though the Court does not wish to downplay the difficulty to N.G. of moving out of SODC, the Court must note that it is also undisputed that N.G.'s parents routinely removed him from SODC. N.G.'s parents used an average of 100 bed holds for N.G. each year, such that he was absent from SODC at least 100 days a year. *See* Doc. 41-6 at PAGEID 438. In light of this, the Court does not believe that Superintendent Gillespie's decision to transition N.G. out of SODC shocks the conscience. Neither the Complaint nor the materials attached thereto support an inference that Superintendent Gillespie acted with an intent to injure N.G. or with deliberate indifference. *See Kerchen*, 100 F.4th at 764 (stating that governmental behavior is "'most likely to rise to the conscience-shocking level' when it is 'intended to injure in some way unjustifiable by any government interest'") (citing *Lewis*, 523 U.S. at 849).

Finally, the Complaint's allegations in support of the substantive due process claim assert that the discharge decision was discriminatory and in violation of state law protections. *See* Am. Compl.,

¶¶ 196–98. N.G.'s interests in being protected from such government conduct are adequately guaranteed by the Equal Protection Clause and procedural due process. Plaintiff cannot base a substantive due process claim on such allegations. *See Puckett*, 566 Fed. App'x at 472 ("To the extent an interest is protected under an 'explicit textual source of constitutional protection,' that particular provision must be the guide for analyzing the claim, rather than the more generalized notion of substantive due process.") (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Accordingly, the substantive due process claim is dismissed.

## H.     Retaliation (Count VII)

Count VII asserts a claim under § 1983 for "Retaliation for Exercising Rights Created by O.R.C. § 5123.62." The Complaint alleges that defendants retaliated against N.G. for the exercise (through his parents) of his rights under O.R.C. § 5123.62 to advocate for his care, raise concerns without fear of reprisal, and to receive services from outside providers.

Defendants argue that the claim should be dismissed because a § 1983 action must be premised upon an underlying violation of federal law, not state law. Plaintiff does not respond to this argument but instead cites to a case reciting the elements of a First Amendment retaliation claim. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). The cited case is inapplicable because the Complaint here does not allege a First Amendment violation. Plaintiff alleges interference with state-created rights.

The Court agrees that plaintiff cannot base a § 1983 claim on a state law violation. Section 1983 creates a civil action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "It has long been established that the violation of a state statute or regulation is insufficient alone to make a claim cognizable under § 1983." *Stanley v. Vining*, 602 F.3d 767, 769 (6th Cir. 2010). *See also Thomas v. Boysen*, No. 23-1960, 2024 WL 4729342, at *1 (6th Cir. Apr. 4, 2024) (the alleged violation must be one of the U.S. Constitution or of federal law) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Plaintiff's § 1983 claim for retaliation is therefore dismissed.

## I.     Injunctive and Declaratory Relief (Counts VIII and IX)

Count VIII seeks injunctive relief to enjoin defendants from discharging N.G. because the discharge decision violates N.G.'s rights under O.R.C. § 5123.62 to receive outside medical services, to have an advocate, and to voice grievances without fear of reprisal. In Count IX, plaintiff again seeks a declaration that defendants have violated N.G.'s rights under § 5123.62 by issuing a discharge decision which does not satisfy the criteria set forth in § 5123.69(C).

25

Defendants argue that these claims must be dismissed because federal courts may not enjoin state officials or issue declaratory relief against them on purely state-law grounds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

In response, plaintiff states unequivocally that "N.G.'s claims are not based on state law." Doc. 55 at PAGEID 686. Plaintiff requests adjudication of the federal claims and explains that to the extent § 5123.62 is being relied on, it is to underpin certain § 1983 claims, such as to create a protected right for purposes of due process. Plaintiff does not respond squarely to defendant's argument that Counts VIII and IX fail under *Pennhurst*.

The Court agrees with defendants that the Court lacks jurisdiction to hear plaintiff's state law claims as presented in the Complaint. The Eleventh Amendment bars federal courts from ordering state officials to conform their conduct to state law, regardless of whether the relief sought is prospective or retroactive. *See Pennhurst*, 465 U.S. at 103–06; *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In light of *Pennhurst* and plaintiff's statement that N.G. is not asserting state law claims, the Court dismisses Counts VIII and IX without prejudice.

## IV. Conclusion

For the reasons stated above, the motion to dismiss (doc. 44) is granted in part and denied in part. The Court dismisses Count IV (Medicaid Act), Count VI (Substantive Due Process), and Count VII (Retaliation) with prejudice. The Court dismisses Count V (Procedural Due Process) and Counts VIII and IX (state law claims) without prejudice. The motion to dismiss is denied as to Count I (ADA), Count II (Rehabilitation Act), and Count III (Equal Protection).

As instructed in a prior Order (Doc. 61), the parties are to meet and confer within 21 days of this Order to "determine whether further proceedings are required regarding Plaintiff's Motion for Preliminary Injunction" and to "address the agreed standstill regarding Plaintiff's care and residency at the SODC." The parties shall submit a joint status report to the Court within 30 days of this Opinion and Order.

The parties' status report should state their respective positions on whether the administrative complaint filed by plaintiff should proceed. In the Court's preliminary view, the availability of state administrative proceedings to review the substantive basis of the discharge decision counsels in favor of a stay of this litigation pending resolution of plaintiff's grievance. *See Carpenter-Barker v. Ohio Dep't*

*of Medicaid*, 752 Fed. App'x 215, 221 (6th Cir. 2018) (noting that state agency proceedings were "better suited to address plaintiff's challenges to defendants' medical judgment" in deciding to lower the private duty nursing hours provided to plaintiff's disabled daughter).

*s/ James L. Graham*
JAMES L. GRAHAM
United States District Judge

DATE: October 9, 2025